

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### No. AP-75,219

### NOAH ESPADA, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL FROM CAUSE NO. 2004-CR-3638
### IN THE 379TH JUDICIAL DISTRICT COURT
### BEXAR COUNTY

**HOLCOMB, J., delivered the opinion of the Court, in which KELLER, P.J., and PRICE and KEASLER, JJ., joined. MEYERS and COCHRAN, JJ., concurred in the result of the Court's disposition of point of error two and otherwise joined in the Court's opinion. WOMACK, J., filed a dissenting opinion, in which JOHNSON, J., joined. HERVEY, J., did not participate.**

A Bexar County jury found appellant guilty of the capital murder of Luther "Luke" Scott.[1]

---

[1] The grand jury, in its indictment, charged appellant with one count of capital murder in two paragraphs. Paragraph A charged appellant with the capital murder of Scott under Texas Penal Code § 19.03(a)(2) (murder in the course of burglary), and Paragraph B charged him with the capital murder of Scott under Texas Penal Code § 19.03(a)(7)(B) (murder of more than one

(continued...)

Based on the jury's answers to the special issues set forth in Article 37.071, §§ 2(b) and 2(e), of the Texas Code of Criminal Procedure, the trial court sentenced appellant to death. We will affirm.

STATEMENT OF FACTS

Appellant worked as a barback (i.e., a bartender's assistant) at the "Poly Esther's" nightclub in San Antonio for approximately four months. Luke Scott was the general manager of the nightclub. In the time appellant worked at the nightclub, he was "written up" over ten times for employee-rule violations. Assistant Manager Trent Merrill, who directly supervised appellant, described him as "lackadaisical" and said that he had "problems following rules." Appellant seemed to blame Scott for his problems at work and told other employees that "he was going to follow [Scott] home and shoot him" and that "if you found [Scott] on the news dead, you know who did it." Other employees overheard appellant say things such as "that bitch is going to get what he deserves" and that he was going to "follow [Scott] home and fuck him up." Appellant believed Scott was mean and later told police that Scott treated him "like a bitch." Eventually, on February 14, 2004, appellant was fired.

Two weeks later, appellant followed Scott home from work and parked outside the apartment-complex gates so he would not be seen. Appellant was not able to see which apartment Scott entered, but he saw a light on in an apartment near where Scott had parked his car. Appellant climbed up onto the balcony of that apartment and entered through the balcony door. Once inside,

---

[1](...continued)
person pursuant to the same scheme or course of conduct). The jury found appellant guilty under both paragraphs.

Paragraph B alleged that appellant's other victim was Sandra Ramos. Appellant's murder of Ramos was the aggravating element that elevated his murder of Scott to a capital offense. *See Narvaiz v. State*, 840 S.W.2d 415, 432-433 (Tex.Crim.App. 1992).

appellant encountered Sandra Ramos. Ramos did not know Luke Scott – appellant had entered the wrong apartment.

For nearly half an hour, Ramos spoke with appellant, attempting to defuse the situation and save her life. Appellant "didn't know what to do but [he] still wanted Luke. [He] didn't want to get caught." Appellant hit Ramos on the back of her head with the butt of his handgun, and then bound her hands and legs with tape. Ramos regained consciousness before appellant placed a plastic trash bag over her head and tightened it. Appellant then took Ramos's truck key and left her apartment while she was still alive.

A few days later, appellant returned to the apartment complex for Scott. This time, appellant climbed onto the balcony of Scott's apartment, cut the screen, and went through the open sliding glass door. Appellant waited in the dark for about an hour before Scott returned home. When Scott entered the apartment and walked down a hallway, appellant met him with a drawn .45 revolver. Appellant shot at Scott, and Scott tried to run away but fell. Appellant shot at Scott two more times, the final time into the back of Scott's head. When appellant left Scott's apartment, he took Scott's car keys, watch, hand-held computer, and wallet, and then drove away in Scott's car.

ADMISSIBILITY OF APPELLANT'S CONFESSION

In point of error six, appellant alleges that the trial court erred in admitting his confession to the murder of Sandra Ramos. Appellant contends that police disregarded his attempt to terminate his interview in violation of Article 38.22 and *Miranda v. Arizona*, 384 U.S. 436 (1966).

On July 14, 2005, the trial court held a hearing on appellant's motion to suppress the confession. At that hearing, the State called San Antonio Police Department Detectives Elizabeth Greiner and Robert Handowski to testify regarding the statements they took from appellant.

Greiner testified that on March 25, 2004, she executed an arrest warrant for appellant for the murder of Luke Scott. Appellant was twice read "his rights" before making a statement in which he confessed to Scott's murder. Greiner testified that, at the time of appellant's arrest, she only "felt" that appellant was involved in Sandra Ramos's murder. According to Greiner, that feeling developed into actual suspicion because (1) appellant's demeanor changed when he was asked to provide a DNA swab and (2) he was hesitant to speak with her regarding Ramos's murder.

Greiner, not wanting to destroy any rapport she had built with appellant, concluded her interview with him. Handowski, who had been investigating Ramos's murder, next spoke with appellant. Handowski testified that, before beginning the interview, he again read appellant his rights. Although police did not have any evidence connecting appellant to Ramos's death, Handowski told appellant that there was a lot of evidence in Ramos's apartment and that he knew appellant had killed Ramos. Initially, appellant denied involvement, but when Handowski talked about the death penalty and religion, appellant responded that he did not want to go to prison, that there was "no pride" in being a woman killer, and that he would "embarrass members of his family and his church." Handowski testified that he told appellant that it would be best to tell the truth and that Ramos' family also needed closure.

Handowski testified that there was a lull in the conversation at this point for a few minutes, during which it appeared to him that appellant was thinking about, or considering, the situation. Handowski told appellant, "Well, let's start with something easy, tell me what you did with her vehicle." Appellant then told Handowski where police could find Ramos's truck. Handowski excused himself to ask other officers to go find the truck. When Handowski returned to the interview room, appellant told him how Ramos' murder occurred.

Appellant argues that the "lull in the conversation" described by Handowski was an assertion of his right to remain silent. Handowski testified, however, that while appellant did not offer anything as Handowski continued talking for a few minutes, he attributed appellant's lack of immediate response to guilt. Handowski also testified that at no time did appellant request termination of the interview or ask for a lawyer. The State argued that appellant's lack of response for a few minutes was not an invocation of his right to silence nor an expression of his desire to terminate the interview.

The trial court agreed with the State and entered the following findings of fact and conclusions of law:

> 1. The defendant's statement to Detective Handowski was made while the defendant was in lawful custody and prior to giving his statement, the defendant was duly warned pursuant to Article 38.22 of his rights.
> 2. Given the totality of the circumstances, the Court concludes that the defendant did not invoke his right to remain silent. Although the defendant was not required to specifically state he was invoking his right, it is not reasonable to infer that the two-minute lull in the conversation, where the defendant had already made statements implicating himself and appeared to be thinking before speaking further, was an invocation of his right to remain silent.
> 3. Based on the foregoing, the Court concludes that the defendant's statement was voluntarily made and is admissible as a matter of law and fact.

At a suppression hearing, the trial court is the sole judge of the credibility of witnesses and the weight of their testimony. *Wyatt v. State*, 23 S.W.3d 18, 23 (Tex. Crim. App. 2000). We will not disturb the trial court's findings if those findings are supported by the record. *Id*. We will only consider whether the trial court properly applied the law to the facts. *Id*.

Before questioning a suspect in custody, law enforcement officials must inform him that he has the right to remain silent and that any statement he makes may be used against him in court. *Dickerson v. United States*, 530 U.S. 428, 438-39 (2000); *Miranda*, 384 U.S. at 444. An accused

must also be advised that he has the right to terminate questioning. Art. 38.22, § (2)(a)(5). The statement of an accused may be used in evidence against him if it appears that it was freely and voluntarily made, without compulsion or persuasion. *See* Art. 38.21. If at any time before or during questioning, a suspect being questioned indicates in any manner that he wishes to remain silent, the interrogation must cease. *Miranda*, 384 U.S. at 473-74. A suspect does not need to use any particular word or phrase to invoke his right to remain silent. *Watson v. State*, 762 S.W.2d 591, 597 (Tex. Crim. App. 1988). Further, silence in the face of repeated questioning can serve as an indication of the desire to invoke the right to remain silent. *Ramos v. State*, 245 S.W.3d 410, 418 (Tex.Crim.App. 2008). However, if a suspect's invocation of his right is ambiguous, an officer is not required to cease questioning. *Dowthitt v. State*, 931 S.W.2d 244, 257 (Tex. Crim. App. 1996).

In this case, the trial court heard testimony during the suppression hearing from Handowski that appellant did not affirmatively invoke his right to silence or attempt to terminate the interview. There was an approximately two-minute lull in the conversation, during which appellant appeared to be thinking. Handowski then posed a question regarding where the police could find Ramos's truck. Handowski left the room to direct other officers to recover Ramos's truck from where appellant said he left it. When Handowski returned, appellant provided a statement detailing Ramos's murder. The record supports the trial court's decision. The trial court did not abuse its discretion in admitting appellant's statement confessing to Ramos's murder. Point of error six is overruled.

RIGHT TO PUBLIC TRIAL

In his fifth point of error, appellant complains that portions of his *voir dire* proceedings were closed to the public, thus depriving him of a public trial. Appellant describes two instances in which

he claims he was denied his right to a public trial. The first instance occurred on August 1, 2005. With appellant present, the trial court held a hearing regarding juror Bowman, who had been selected but not yet sworn. During that hearing, Bowman was excused because of a family bereavement. Appellant complains that this hearing, which appears to have been held in chambers, deprived him of the right to a public trial. Appellant bases his complaint on a single statement made by the trial court that "I've got all the lawyers and the defendant in my office." There is no indication on the record that this was a closed hearing. There is no mention by the trial court, the State, or the defense that members of the public or the media were prevented from attending the hearing.

In the second instance, on August 2, 2005, before proceeding to select a juror to replace Bowman, the trial court stated:

> Just so the record reflects this, I had a conversation with Mr. Lou Aboud. He wanted to come and watch jury selection process this morning. We've been taken out of the conference room and put in the jury room. We're short a bailiff today. So I informed him that it would not be possible for anybody to be in the jury room today due to security issues. I suppose if the media wanted to come in, we could make an exception, but we're excluding family members this morning until we can get back in the conference room.

Appellant complains that, by closing the proceedings to family members, the trial court denied him the right to a public trial.

The Sixth Amendment guarantees to the accused in all criminal prosecutions the right to a "public trial." This fundamental right was extended to defendants in state criminal prosecutions through the Fourteenth Amendment. *See In re Oliver*, 333 U.S. 25 (1948); *see also Herring v. New York*, 422 U.S. 853, 856 (1975). The record reflects, however, that appellant failed to object at trial that he was being denied the right to a public trial. Therefore, he forfeited the right to raise this complaint on appeal. *Levine v. United States*, 362 U.S. 610, 619 (1960); *Brandley v. State*, 691

S.W.2d 699, 707 (Tex.Crim.App. 1985); Tex. R. App. Proc. 33.1. We overrule point of error number five.

## ADMISSION OF PHOTOGRAPHS

In point of error twenty-seven, appellant claims that the trial court erroneously admitted evidence in violation of Rule 403 of the Texas Rules of Evidence. He specifically complains about crime scene photographs (State's Exhibits 92-93, 95-97, 113, and 159-164) and autopsy photographs (State's Exhibits 3, 172-176, and 179-189B) that were admitted over defense objection. Appellant claims that this evidence was "gratuitously" and unfairly prejudicial. Appellant argues that the photographs were duplicative and show facts or circumstances that were otherwise established, thus limiting their probative value.

Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." *See Gigliobianco v. State*, 210 S.W.3d 637 (Tex.Crim.App. 2006). A court may consider many factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice, etc. The factors include: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black-and-white, whether they are close up, whether the body depicted is clothed or naked, the availability of other means of proof, and other circumstances unique to the individual case. *Santellan v. State*, 939 S.W.2d 155, 172 (Tex. Crim. App. 1997); *Long*, 823 S.W.2d 259, 272 (Tex.Crim.App. 1991). The admissibility of photographs over an objection is within the sound discretion of the trial court. *Sonnier v. State*, 913 S.W.2d 511, 518 (Tex. Crim. App. 1995). Autopsy photographs are generally admissible, unless they depict

mutilation of the victim caused by the autopsy itself. *Santellan*, 939 S.W.2d at 172.

State's Exhibits 92, 93, 95 - 97, and 113 are photographs taken at the Scott crime scene and introduced though the testimony of Louis Resendez.[2] State's Exhibits 92-97 are photographs showing Scott's body as it was found in the living room of his apartment from different angles and at different ranges. State's Exhibit 113 is a photograph showing a bullet fragment found lodged beneath the carpet in Scott's living room.

State's Exhibits 159-164 are photographs that were taken at the Ramos crime scene and introduced through the testimony of Detective Titus. The photographs were taken from different angles and different ranges and focus on different aspects of the crime scene, including the evidence of a struggle, the tape used to bind Ramos' hands and feet, and the plastic bag twisted around her head.

State's exhibits 3, 172-176, and 179 are autopsy photographs of Scott that were introduced during the testimony of medical examiner Dr. Diane Kimberly Molina. State's Exhibit 3 is a photograph of Scott from the shoulders up with a numbered placard that was used as the identification photo for the autopsy file. State's Exhibits 172-176 are autopsy photographs showing the bullet entrance and exit wounds on Scott's head. State's Exhibit 179 shows the damage done to Scott's brain with the skull refracted. Dr. Molina testified that the skull was refracted in that photograph in order to show the damage to the brain that could not be seen otherwise.

State's Exhibits 180-189B are photographs taken during the autopsy of Sandra Ramos and introduced during Dr. Molina's testimony. State's Exhibit 180 is an autopsy identification

---

[2] Only photocopies of the photographs, in which some details were indistinguishable, were included in the record on appeal. However, pursuant to TEX. R. APP. PROC. 51(d), the Clerk of this Court obtained the original exhibits for our inspection.

photograph of Ramos from the shoulders up with the corresponding file number showing on a placard. State's Exhibit 186 is a close-up photograph of the laceration on the right side of Ramos's head above the ear. State's Exhibits 181-185 and 187-189B are autopsy photographs taken from different angles and ranges showing how the plastic bag was twisted around Ramos's head, how her hands and feet were bound, and how duct tape was circled around her head, over her face, and into her mouth.

The crime-scene photographs reflect the fact and the manner of the victims' deaths and are no more gruesome than the offenses themselves. The photographs depict facts that had been testified to by witnesses at trial and which were relevant to the manner in which the offenses were committed. Some of the photos were closeup and showed the details of the damage sustained by the victims. Appellant urges that photographs of Ramos should have been excluded because they show early stages of decomposition that was the result of decay rather than the cause of death. The medical examiner did explain to the jury that Ramos's body had begun to decompose and that the autopsy photographs depicted the body at the time it was received at the morgue. The autopsy photos of both Scott and Ramos show the condition of the bodies and the wounds received and, except for State's Exhibit 179, do not show any mutilation of the bodies. State's Exhibit 179 shows Scott's brain with the skull refracted, which Dr. Molina explained was necessary to clearly show the damage the bullet did to Scott's brain. Because Dr. Molina needed the photograph to show an injury that was otherwise not visible, showing refraction of the skull is not fatal to the admissibility of State's Exhibit 179. *See Harris v. State*, 661 S.W.2d 106, 108 (Tex. Crim. App. 1983) (explaining that because refracting the skin from a victim's skull did not "obfuscate the results of the crime" but allowed the jury to see the injury, there was no error in admitting the photograph). Contrary to

appellant's position, depiction of a victim's body at the precise time of death is not a prerequisite for admissibility of photographs, nor is it fatal to the admissibility when photos show decomposition. *See Madden v. State*, 799 S.W.2d 683, 697 (Tex. Crim. App. 1990) (deciding that photographs were admissible despite showing decomposition and change caused by submersion in water for five days); *Knoppa v. State*, 505 S.W.2d 802, 803 (Tex. Crim. App. 1974) (determining that photographs showing the presence of decomposition and maggots on the body were admissible).

Considering all factors, we cannot conclude that the probative value of the photographs was substantially outweighed by their prejudicial effect, etc. The trial court did not abuse its discretion in admitting the photographs at trial. Point of error twenty-seven is overruled.

SUPPLEMENTAL JURY CHARGE

In his first point of error, appellant alleges that the trial court committed error in its supplemental charge to the jury. During deliberations on guilt or innocence, the jury sent a note to the trial court asking, "During the sentencing phase, will we have access to the evidence?" The trial court related the contents of the note to all parties and informed them of the proposed supplemental charge: "In response to your note, I instruct you as follows: The answer is yes. Please continue your deliberations." The trial court asked whether there were any objections to this supplemental charge, and neither the defense nor the State objected.

When a trial court responds substantively to a jury question during deliberations, that communication essentially amounts to an additional or supplemental jury instruction. *See Daniell v. State*, 848 S.W.2d 145, 147 (Tex.Crim.App.1993). Article 36.14, which governs the court's charge, provides in relevant part: "the judge shall . . . deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case." Article 36.14 does not authorize the trial court

to give instructions with regard to factual matters, but only to applicable law.

Because appellant did not object, any error in the jury charge does not result in reversal "unless it was so egregious and created such harm that appellant was denied a fair trial." *Almanza v. State*, 686 S.W.2d 157, 171(Tex. Crim. App. 1984) (op. on reh'g). To determine "egregious harm," we examine "the entire jury charge, the state of the evidence, including the contested issues and weight of the probative evidence, the arguments of counsel, and any other relevant information revealed by the record of the trial as a whole." *Id*. Appellant must have suffered actual, rather than theoretical, harm. *Arline v. State*, 721 S.W.2d 348, 352 (Tex. Crim. App. 1996). "Errors that result in egregious harm are those that affect 'the very basis of the case,' 'deprive the defendant of a valuable right,' or 'vitally affect a defensive theory.'" *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996).

Appellant argues that the trial court's supplemental charge destroyed his presumption of innocence, relieved the State of its burden of proving its case beyond a reasonable doubt, conveyed the trial court's opinion regarding the merits of the case to the jury, deprived appellant of his right to an impartial judge, undermined the bifurcated system of the death penalty trial, and sanctioned jury misconduct.

Assuming for the sake of argument that there was error in the supplemental charge, we find no "egregious harm." First, looking at the entire jury charge, we find that the charge at guilt/innocence properly instructed the jury. During deliberations, the trial court responded to a straightforward question from the jury with a straightforward answer that addressed the question posed. The jury asked whether it would have access to evidence during punishment deliberations, and the trial court responded that it would. The trial court's response did not instruct the jury on a

factual matter regarding the evidence or on the merits of the case. *Compare Daniell*, 848 S.W.2d at 147 (finding that the trial judge's substantive response to the jury that there were no correctional facilities available in Hill County constituted an improper instruction on a factual matter) with *Green v. State*, 912 S.W.2d 189, 193-94 (Tex. Crim. App. 1995) (determining that the trial court's response to the jury that a witness "never used the term 'emotional problems'!" neither expressed the trial court's opinion regarding the testimony nor instructed the jury on a factual matter).

A review of the evidence shows that the jury heard appellant's own statements to police in which he admitted killing both Scott and Ramos. Further, through defense counsel's arguments, the jury was well aware of the probability of a punishment phase. In fact, counsel admitted to the jury that "we all understand which part of a trial like this is going to be important" and explained that following punishment, jurors would be able to speak with him. Counsel further told jurors that he wanted them "very seriously to go through the evidence in this case and be familiar with it. Because at the punishment phase in a case like this we talked about those questions and the answers to those questions. The evidence of the case is very important."

In this case, the trial court's response did not destroy appellant's presumption of innocence and did not relieve the State of proving its case beyond a reasonable doubt. The trial court's response had no bearing on the bifurcated system of the death-penalty trial, nor did it sanction any sort of jury misconduct. Finally, the trial court's response expressed no opinion regarding the merits of the case and did not deprive appellant of an impartial judge. The record does not show that appellant suffered egregious harm from the supplemental charge. Point of error one is overruled.

EXPERT TESTIMONY

In point of error two, appellant argues that the trial court erred, at the punishment stage, in

admitting the testimony of Dr. Richard Coons, a psychiatrist, on the subject of appellant's future dangerousness.[3]  Appellant argues that Coons's testimony "failed to satisfy any of the criteria for admissibility" under Texas Rule of Evidence 702.[4]  More specifically, appellant argues that Coons: (1) "never authored a paper on the subject of future dangerousness"; (2) "had no 'hard core data' to support his opinion"; (3) had . . . no research to confirm the error rate of his previous predictions of future dangerousness"; and (4) "[was] [u]nable to cite any established body of scientific work on the prediction of future dangerousness."

Before allowing Coons to testify before the jury, the trial court held a hearing outside the presence of the jury on the question of the admissibility of Coons's testimony under Rule 702.  At that hearing, Coons testified that: (1) he was a board-certified psychiatrist with thirty-one years of experience in forensic psychiatry; (2) in the course of his career, he had "evaluated" more than 7,000 persons charged with crimes; (3) taking various factors into account, he could oftentimes formulate an opinion regarding a defendant's future dangerousness; (4) he did not know his rate of error; (5) his opinion regarding a defendant's future dangerousness was ultimately based on his professional training and experience; (6) among the factors he considered were the defendant's personality, the defendant's history of violence, the defendant's attitude toward violence, the nature of the crime in question, the defendant's "behavior patterns" during his lifetime, the defendant's physical abilities,

---

[3]  Coons testified before the jury that, more likely than not, appellant would be a future danger.

[4]  Appellant also argues that the trial court erred in admitting Coons's testimony because that testimony was "so unreliable as to violate the Due Process clause of the Constitution of the United States."  The record reflects, however, that appellant neither raised, nor received a ruling on, this argument in the trial court.  Therefore, this argument is not preserved for appellate review.  *See* Tex. R. App. Proc. 33.1.

whether the defendant has expressed remorse, whether the defendant has a conscience to help him control his behavior, and the defendant's probable future location (prison); (7) other professionals used the same factors in assessing future dangerousness; (8) his methodology was not based on any specific scientific study; (9) it is impossible to conduct accurate scientific research regarding capital defendants' future dangerousness because such defendants "go to death row"; (10) it is impossible to "get the same level of hard data reliability [about future dangerousness] that you can [get] in [the] hard sciences"; (11) he had attended many professional seminars concerning future dangerousness but had written no papers on that subject; (12) he had read much about, and had consulted many other professionals about, future dangerousness; (13) "psychiatrists are called upon to make judgments about people's [future] dangerousness all the time," e.g., before "commit[ting] somebody [involuntarily to a mental institution], we're asked to determine whether they're likely to be dangerous to themselves or others"; (14) psychiatrists "rely on history to make predictions about the future"; and (15) psychiatrists "can reach conclusions [about future dangerousness], and do [so] all the time, about people who are charged with crimes." Appellant offered no evidence to rebut Coons's testimony but argued that his testimony was inadmissible nevertheless because his "methodology of making predictions of future dangerousness [was] not based upon a scientific foundation" and "he [could] not identify any error rates or things like that."

An appellate court may not disturb a trial court's evidentiary ruling absent an abuse of discretion. *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex.Crim.App. 2007). In other words, if the trial court's ruling is supported by the record and is correct under any applicable legal theory, it must be upheld. *Ibid.* In addition, an appellate court reviewing a trial court's evidentiary ruling must do so in light of the arguments, information, and evidence before the trial court at the time it ruled.

*Dragoo v. State*, 96 S.W.3d 308, 313 (Tex.Crim.App. 2003).

Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Generally speaking, under Rule 702, the proponent of scientific evidence must show, by clear and convincing proof, that the evidence he is offering is sufficiently relevant and reliable to assist the jury in accurately understanding other evidence or in determining a fact in issue. *Hernandez v. State*, 116 S.W.3d 26, 30 (Tex.Crim.App. 2003); *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex.Crim.App. 2000). The reliability of soft-science evidence, such as was offered in this case, may be established by showing that : (1) the field of expertise is a legitimate one, (2) the subject matter of the expert's testimony is within the scope of that field, and (3) the expert's testimony properly relies upon or utilizes the principles involved in that field. *Russeau v. State*, 171 S.W.3d 871, 883 (Tex.Crim.App. 2005); *Nenno v. State*, 970 S.W.2d 549, 561 (Tex.Crim.App. 1998).

On this record, we discern no abuse of discretion on the part of the trial court in its admission of Coons's testimony. Given the arguments, information, and evidence before the trial court at the time it ruled, the trial court could have reasonably concluded that psychiatry was a legitimate field of expertise, that predicting future dangerousness was within the scope of psychiatry, and that Coons's testimony would properly rely upon the principles involved in psychiatry. Coons testified that he was an experienced psychiatrist, that psychiatrists are called upon to make predictions of future dangerousness "all the time," and that they do so utilizing such factors as he set forth. Appellant offered no evidence to rebut Coons's testimony. The fact that Coons did not know his rate of error is not dispositive. *Nenno v. State*, 970 S.W.2d at 561. We overrule point of error two.

In point of error three, appellant alleges that the trial court erred in admitting the testimony of expert witness A.P. Merillat regarding the violent acts and presence of gangs in the prison system. Appellant claims that Merillat's testimony was unfairly prejudicial and deprived him of the right to an individualized determination of his sentence.

On voir dire examination, Merillat told the trial court that he could testify regarding the opportunities that exist in the penitentiary for a person to be violent as well as the existence and recruiting procedures for gangs in the penitentiary. Merillat stated that he could testify about capital murderers who received life sentences and who have committed violent crimes or have been prosecuted for drug offenses.

Appellant objected that "any of the testimony that [Merillat] would make could have an effect of being so highly prejudicial against [appellant] to outweigh its probative value." Appellant also objected that Merillat's testimony would "be invading the province of the jury by explaining to the jury these things in regards to generally, but nothing is going to be specific to my client that's going to be relevant to answer either Question Number One or Question Number Two of the special issues."

The trial court partially ruled in favor of appellant, telling Merillat:

I will permit you to testify based on your expertise of prison life, violent acts going on in prison; that people can commit those types of acts. I will also permit you to testify that gangs exist in prison. Beyond that, the odds of the defendant joining a gang, being pressured into a gang, at least at this point, I'm not going to let in. I think the prejudicial effect really outweighs any probative value given the complete lack of any gang affiliation with this defendant.

Merillat then testified before the jury, first explaining how the classification system within the penitentiary is based on the length of an inmate's sentence rather than his offense and describing

how, based on an inmate's classification, it is determined whether an inmate is allowed to work, go to school and other programs, have visitation, or even have a cellmate. Merillat explained that a capital murderer would not automatically be placed in administrative segregation upon entering the prison system, but would be in the general population. Merillat described for the jury the types of violent crimes that happen in prisons and confirmed that gangs do exist in prison.

Merillat's testimony comported with the trial court's ruling, which directly addressed appellant's objection at trial. Based on the record before us, we cannot say that the trial court abused its discretion. Point of error three is overruled.

FAILURE TO GRANT MISTRIAL

In his point of error seven, appellant alleges that the trial court erred in refusing to grant a mistrial following the State's introduction of unfairly prejudicial evidence regarding information obtained from a cellular-phone address book during the guilt/innocence phase. In point of error nine, appellant argues that the trial court erred in refusing to grant a mistrial following several prejudicial sidebar comments by the State during the punishment phase.

A mistrial is appropriate for "highly prejudicial and incurable errors." *Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003). We review the denial of a motion for mistrial under an abuse of discretion standard. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). When considering whether a trial court abused its discretion in denying a mistrial, we look to: (1) the severity of the misconduct (the magnitude of the prejudicial effect); (2) the measures adopted to cure the misconduct (the effectiveness of any cautionary instruction by the judge); and (3) the certainty of conviction absent the misconduct. *Id*.

During the testimony of San Antonio Police Department Detective Elizabeth Greiner, the

State elicited testimony that she had found a cellular phone believed to belong to appellant in his backpack. Greiner copied the phone's address book; she testified that one entry stood out to her. Greiner testified that the entry was "Kill U 1 Day." The defense objected, and the State conceded that the listing was not connected to either Scott or Ramos, but belonged to the former boyfriend of appellant's girlfriend. The trial court sustained the defense objection and instructed the jury to disregard the testimony, but denied a motion for a mistrial.

During punishment, the defense called jail inmates Mario A. Rocha, Juan Martinez, and Immanuel Cotton to testify on appellant's behalf regarding his behavior in jail. When Rocha explained a prior conviction for forgery in a way that minimized his actual participation in the offense, the prosecutor remarked, "My God. You've never done anything wrong in your life, have you? Besides Noah you must be the most misunderstood person in this room, sir." The defense objected. The trial court sustained the objection and instructed the jury to disregard, but it denied a motion for mistrial. Martinez testified that he thought man as well as God could forgive crimes, and the prosecutor responded, "Not some of the people in this room, sir." Again, the defense objected, and the trial court sustained the objection. The jury was given an instruction to disregard, but the trial court denied the defense motion for a mistrial. Finally, during Cotton's testimony, the following exchange took place:

> [State:] I guess when you saw the defendant rip that disciplinary report up, I don't guess you saw him looking over at you and the other inmates there in the dayroom laughing and smiling about it, [did] you?
>
> [Cotton:] No, ma'am.
>
> [State:] I didn't think so.

Defense counsel objected once again. The trial court sustained the objection and instructed the jury

to disregard, but denied the defense motion for mistrial.

In each of the complained-of instances, the trial court immediately instructed the jury that it was to disregard the testimony or comments. During the guilt phase, the jury had before it the statements appellant made to police admitting he had killed Ramos and Scott; detailing how he had stalked Scott to his apartment complex; explaining that he had killed Ramos because he still wanted to kill Scott and did not want to get caught; and describing how he had waited in the dark for Scott to return home. During the punishment phase, the jury heard further testimony of how appellant had told others he intended to kill Scott and of how appellant behaved while in custody.

In each of the complained-of instances, the trial court gave the jury an instruction to disregard which, under the circumstances, was sufficient to cure any error. The trial court did not abuse its discretion in denying the motions for mistrial in any of these situations. Points of error seven and nine are overruled.

## IMPROPER EXCLUSION OF EVIDENCE

In point of error eight, appellant alleges that the trial court, at the punishment stage, improperly excluded the testimony of Nicole Barton regarding Scott's behavior toward his employees. Appellant argues that Barton's testimony was offered to rebut evidence presented by the State and was relevant to mitigate appellant's sentence.

During the punishment phase, the defense called Barton, a former Poly Esther's employee who had worked for Scott. Barton testified that she worked for Scott at the nightclub in 2000 or 2001 when she was 18 or 19 years old, that Scott was a "tyrant," and that he treated employees as though they were expendable. The State objected when the defense attempted to question Barton regarding why she developed her opinion of Scott. The State objected that Barton's testimony was

irrelevant, too remote in time, and prohibited under Texas Rule of Evidence 404.

Appellant proffered testimony from Barton that he wanted admitted in evidence. Outside the presence of the jury, Barton stated that Scott made her cry and belittled her. She described one occasion when she was working but was in extreme pain. She testified that she could not breathe and needed to vomit but that Scott told her that if she left she would be fired. Barton discovered that she had a kidney stone and needed medical treatment. Barton described how Scott berated the barbacks, told them that they were expendable, and never told them they did a good job. Barton testified that she quit after working at the nightclub for only six months. She described one evening when she returned to the nightclub to pick up a security guard with whom she had a personal relationship. According to Barton, Scott told her to stay away from his business, that she had no right to be there, and that if any security guards were seen with her, they would be fired. The trial court sustained the State's objection, ruling:

> I'm going to find that her testimony, given the remoteness of when this occurred, years ago; that she doesn't know the defendant; she's never met the defendant; she was never a witness to any actions between the defendant and the complainant; is too far removed. That the prejudicial effect of the testimony clearly outweighs the probative value. And I don't believe it's relevant at this point.

A trial court, at the penalty stage of a capital-murder trial, has wide discretion in admitting or excluding evidence. *Ford v. State*, 919 S.W.2d 107, 114 (Tex. Crim. App. 1996); *Lane v. State*, 822 S.W.2d 35, 41 (Tex. Crim. App. 1991). During the punishment "proceeding, evidence may be presented by the State and the defendant ... as to any matter that the court deems relevant to sentence." Art. 37.071, § 2(a)(1). Relevant evidence is evidence that has a tendency to make the existence of any fact more or less probable than it would be without the evidence. TEX. R. EVID. 401. Evidence that is not relevant is not admissible. TEX. R. EVID. 402.

Here, the trial court determined that the evidence the defense offered was not relevant. Barton's interactions with Scott occurred several years before his death. Barton quit her employment long before appellant began working at Poly Esther's. Barton did not know appellant and had never witnessed any exchanges between Scott and appellant. Because this testimony did not tend to make the existence of any fact regarding Scott's interactions with appellant more or less probable, the trial court did not abuse its discretion in excluding Nicole Barton's testimony. Point of error eight is overruled.

FAILURE TO GIVE ARTICLE 37.071, § 2(f)(3), INSTRUCTION

In his fourth point of error, appellant complains that the trial court, when instructing the jury regarding the mitigation special issue, failed to give the instruction contained in Article 37.071, § 2(f)(3). At punishment, the trial court instructed the jury:

> The Second Issue is:
>
> State whether, taking into consideration all the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or are sufficient mitigating circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

However, jurors were not instructed that they "need not agree on what particular evidence supports an affirmative finding on the issue" regarding the mitigation special issue. Art. 37.071, § 2(f)(3).

Appellant argues that the charge robbed him of the safeguard of having jurors made unambiguously aware that they did not need to agree on the particular evidence that supported a "yes" answer to the mitigation issue. Appellant further argues that the instruction skewed the jury's understanding in the prosecution's favor. As we understand appellant's argument, he is complaining that he was denied the constitutional guarantee of jury unanimity.

Appellant did not object to the charge, but now contends that the lack of the instruction egregiously harmed him under the standard set out in *Almanza*, 686 S.W.2d at 171. Appellant relies on *Mills v. Maryland*, 486 U.S. 367 (1988), to support his argument that the lack of the Article 37.071, § 2(f)(3), instruction requires reversal. The charge in *Mills* listed the statutorily available mitigating circumstances in that case and directed jurors to unanimously affirm whether they agreed or disagreed that each circumstance did or did not exist. *Id*. at 378. The United States Supreme Court found that such a charge as given may have required that all jurors unanimously agree on the mitigating circumstances before finding that they warranted a life sentence. *Id*. at 384. However, even when presented with the circumstances in *Mills*, the Supreme Court did not go as far as to say that it is a constitutional requirement that every jury deliberating punishment in a capital case should be explicitly instructed that they need not agree on the particular mitigating circumstances.

In this case, while jurors were not given the statutorily required instruction that they need not agree on the particular mitigating evidence, they unanimously found that no sufficient mitigating circumstance or circumstances warranted that a life sentence be imposed. The foreman signed the answer that stated: "We, the jury, unanimously find and determine that the answer to this Special Issue is 'No.'" Because no juror believed there was a circumstance or circumstances that warranted a life sentence, there was no possibility that the jurors would be confused about a need to agree on a particular circumstance or circumstances.

Although the trial court erred in failing to give the statutory instruction, in this case appellant was not deprived of the constitutional guarantee of a unanimous verdict and did not suffer egregious harm from the trial court's failure to include the Article 37.071, § 2(f)(3), instruction. Nor was appellant denied a fair trial. Point of error four is overruled.

INSTRUCTIONS REGARDING VICTIM IMPACT EVIDENCE

In point of error eleven, appellant alleges that the trial court violated the Eighth and Fourteenth Amendments by failing to provide requested instructions regarding victim-impact evidence to the jury at punishment.

Appellant complains first that the jury should have been instructed that its consideration of victim-impact evidence should not be conducted in connection with the future dangerousness special issue. This requested instruction, however, is a misstatement of the law. This Court has said that victim-impact evidence is relevant to the future dangerousness special issue if a defendant could have reasonably foreseen the impact of the victim's death on others. *See Jackson v. State*, 33 S.W.3d 828, 833-34 (Tex. Crim. App. 2000).

Appellant also argues that the trial court erred in refusing "to instruct the jury to disregard victim impact evidence that was not shown to be within the knowledge or reasonable expectation of the defendant." Appellant argues that the trial court should have given such a limiting instruction because he could not have had any specific knowledge regarding the impact of the victims' deaths on their parents and other loved ones. We reject appellant's argument. Victim impact evidence is relevant to the mitigation special issue regardless of whether, at the time of the murders, the defendant was, or reasonably should have been, aware of the impact the victims' deaths might have on others. *See Mosley v. State*, 983 S.W.2d 249, 261 n. 16 (Tex.Crim.App. 1998). Therefore, the trial court would have erred in giving the requested instruction.

Appellant additionally complains that the trial court failed to instruct the jury that its consideration of victim-impact evidence did not relieve the State of its burden to prove future dangerousness beyond a reasonable doubt. This requested instruction is not required by the law.

The jury was instructed that the State was required to prove future dangerousness beyond a reasonable doubt, and we presume the jury followed the instructions it was given. *Cobarrubio v. State*, 675 S.W.2d 749, 752 (Tex. Crim. App. 1983). During its argument to the jury at punishment regarding future dangerousness, the State did not dwell on the victim-impact testimony given by the victims' families. Rather, the State concentrated on the circumstances surrounding the victims' deaths and appellant's actions afterwards. In addition to the facts of the offense, the State presented evidence that, shortly after being jailed for the instant offense, appellant attacked another inmate. Appellant was found with drugs and weapons in his jail cell, and, even after the trial process had begun, he tore up a disciplinary report and physically assaulted a jail guard.

Finally, Appellant complains that the trial court refused to instruct the jury not to make a comparative worth analysis of the value of the victims to their families and the community compared to the defendant or other members of society. Appellant complains that the State encouraged the jury to make such a comparison during closing argument at punishment and should have therefore been instructed not to make a comparative worth analysis. Appellant argues that the State asked the jury to "decide what to do with one life because of the two lives that he took" and to "give Luke and Sandra the same amount of consideration." Appellant contends that the State asked the jury to compare and contrast him with Luke and Sandra when the prosecutor stated: "And when you're back there and you're looking at those photos of the defendant, and you're comparing and you're thinking about the defendant and about Luke and Sandra, ask yourself this: What is one of the major differences between the defendant and Luke and Sandra[?]" Appellant complains that the jury was improperly urged to "give them, Sandra and Luke, the consideration that he did not give them in life."

Appellant, however, mischaracterizes the State's arguments to the jury. During closing arguments at punishment, the State argued to the jury:

> Ladies and gentlemen, over the last couple of days you've had an opportunity to hear a great deal about the defendant, about his family, about his background, about his upbringing. But right now I'd like to take the opportunity to turn your attention back to why we're here.
>
> You're here right now to decide what to do with one life because of the two lives that he took. So I want you to think about Luke and Sandra during your deliberations. This is certainly the time for you all to remember them.
>
> And when you go back to the jury room, you're going to have a stack of photographs that the defense has admitted, photos of the defendant when he was a child, with his family. And you're going to be able to look at those.
>
> * * *
>
> And when you're back there and you're looking at those photos of the defendant, and you're comparing and you're thinking about the defendant and about Luke and Sandra, ask yourself this: What is one of the major differences between the defendant and Luke and Sandra during this trial?
>
> Isn't the major difference that he has had an opportunity to explain to you why his life should be spared? Did Luke have that opportunity? No. The defendant decided that Luke Scott needed to die.
>
> * * *
>
> What about Sandra? Actually, we know Sandra did have an opportunity. She had an opportunity to explain why he should spare her life. He gave her 30 minutes to talk to him. ... Her pleas for her life fell on his deaf ears.
>
> But now he has the opportunity – his family has the opportunity to plead for his life.
>
> So I'm going to ask you that while you're back there and you're deliberating, that you give them, Sandra and Luke, the consideration that he did not give them in life.

The State did not ask the jury to make a comparative worth analysis of the value of the

victims to their families and the community compared to appellant or other members of society. Rather, the State personalized the victims just as the defense personalized appellant. On this record, and in the absence of a statutory requirement directing that the jury be instructed as appellant argues regarding victim-impact evidence, the trial court committed no error in not giving these instructions to the jury. Point of error eleven is overruled.

DEFINITIONS

In points of error twelve, thirteen, and fifteen, appellant complains that the trial court failed to define "probability," "criminal acts of violence," and "continuing threat to society" for the jury during the punishment phase. In point of error fourteen, appellant argues that the trial court erred in failing to define the word "militates" so as to preclude consideration of the defendant's age, race, sex, national origin, religion, political views, or sexual orientation as a factor supporting a death sentence. This Court has previously stated that words and phrases that are not statutorily defined are to be given their usual meanings and no specific instructions are required for those words or phrases. *Blue v. State*, 125 S.W.3d 491, 504-05 (Tex. Crim. App. 2003); *Martinez v. State*, 924 S.W.2d 693, 698 (Tex. Crim. App. 1996); *Garcia v. State*, 887 S.W.2d 846, 859 (Tex. Crim. App. 1994); *Earhart v. State*, 877 S.W.2d 759, 767 (Tex. Crim. App. 1994). Appellant has provided us with no reason to revisit the issue here. Points of error twelve, thirteen, fourteen, and fifteen are overruled.

In point of error twenty-three, appellant complains that the trial court unconstitutionally charged the jury in language that "trivialized the value of life" and increased the likelihood that a death sentence would be imposed. Appellant specifically argues that using the terms "probability," "threat," and "continuing" without proper explanation trivializes the value of human life and the

legal process used to choose between life and death. This Court has previously rejected claims that the Texas capital sentencing scheme is unconstitutional for failing to define the terms "probability" and "continuing threat to society." *Escamilla v. State*, 143 S.W.3d 814, 828 (Tex. Crim. App. 2004). Point of error twenty-three is overruled.

THE CHARGE AT PUNISHMENT

In point of error sixteen, appellant complains that the trial court failed to instruct the jury so as to limit the scope of militating evidence to that which a juror might regard as increasing appellant's moral blameworthiness. Appellant appears to argue that, because the trial court did not give this instruction, the jury could have sentenced him based on his religious and insular upbringing, thus removing the jury's focus from his culpability and denying him an individualized consideration prior to imposing a death sentence. There are no constitutional or legislative requirements for an instruction that limits the scope of militating evidence to that which the jury might consider as increasing a defendant's moral culpability. Further, the State's arguments to the jury regarding both the future dangerousness and mitigation special issues focused on appellant's actions and appellant's blameworthiness. There were no arguments presented that encouraged the jury to consider any evidence other than that which indicated increased moral culpability on the part of appellant. Point of error sixteen is overruled.

In point of error seventeen, appellant complains that the trial court failed to instruct jurors that the finding of guilt in the first phase of trial did not foreclose consideration of evidence that they believed tended to reduce appellant's moral blameworthiness. At punishment, the trial court instructed the jury that it was to "consider all the evidence in this case" and that it was to "consider all evidence admitted at the guilt or innocence and the punishment stage, including evidence of the

defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty." While the trial court's instruction to the jury did not track appellant's requested language, the instruction given accomplished the same goal. The trial court did not commit error. Point of error seventeen is overruled.

In point of error eighteen, appellant alleges that the trial court violated the Eighth Amendment by failing to instruct the jury that there is no presumption in favor of death. Appellant argues that the jury should have been instructed that even if they found appellant a future danger in response to the first special issue, the mitigation special issue was to be considered independently without regard to the jury's finding regarding the first special issue.

Article 37.071 provides that a jury may not consider the mitigation special issue until it affirmatively answers the future dangerousness special issue. Further, once the jury reached the mitigation special issue, it was entitled to, and even required, to consider all of the evidence. Article 37.071 does not require a specific instruction spelling this out to the jury. Nor does anything in this record or the Constitution demand that such an instruction be provided. Appellant's requested instruction would have been a misstatement of the law. Point of error eighteen is overruled.

In point of error nineteen, appellant complains that the trial court unconstitutionally failed to instruct the jury "so as to provide a vehicle for a juror to return a life verdict where the juror concludes that the aggravating factors, although established by the evidence, still are not so severe as to call for death as a punishment." Appellant cites to *Smith v. Texas*, 543 U.S. 37 (2004), to support his argument that the charge "does not allow for a life sentence in the case where circumstances exist that may lessen the applicability of the death penalty despite the existence of a finding that the defendant will commit future acts of violence." Appellant appears to be arguing that

he was not given a sufficient vehicle by which the jury could consider his mitigating evidence.

The Supreme Court's decision in *Smith* addressed the constitutionality of a non-statutory, "nullification" special issue that effectively instructed the jury to change one of its "yes" answers to one of the statutory special issues to a "no" answer if the jury believed that mitigating circumstances existed warranting a sentence less than death. *See Smith*, 543 U.S. at 38-39, 45-49. The statutory mitigation special issue submitted in this case is nothing like the "nullification" instruction at issue in *Smith*. The statutory mitigation special issue in this case provided appellant's jury with a vehicle to fully consider and give effect to appellant's mitigating evidence without requiring the jury to disregard its oath and instructions by changing its answer to the other special issue. Unlike the jury in *Smith*, the jury in this case could have fully considered and given effect to appellant's mitigating evidence by providing a "yes" answer to the mitigation special issue thus resulting in a life sentence. Point of error nineteen is overruled.

In points of error twenty-two and twenty-four, appellant alleges that the trial court's instructions at punishment unconstitutionally "failed to provide the jury the opportunity to have its decision reflect a 'reasoned moral response'" to appellant and his offense and failed to provide a satisfactory process for considering and giving effect to mitigating circumstances. Appellant specifically argues that the jury instructions suggest that if mitigating circumstances are not sufficient in relation to future dangerousness, a death sentence is warranted.

Under the Texas capital-sentencing scheme, when mitigating evidence is presented, jurors individually determine what evidence, if any, mitigates against the imposition of the death penalty and what weight, if any, to give that evidence in their consideration. *Threadgill v. State*, 146 S.W.3d 654, 671 (Tex. Crim. App. 2004). Article 37.071, § 2(e), provides that the jury "shall" answer the

mitigation issue, which directs "considerations of all evidence, including circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant." This Court has previously determined that Article 37.071 is constitutional because it requires the jury to consider all of the evidence and determine whether such mitigating circumstances exist as to warrant a life sentence. *Threadgill*, 146 S.W.3d at 671; *see also Saldano v. State*, 232 S.W.3d 77, 100-01 (Tex. Crim. App. 2007). Points of error twenty-two and twenty-four are overruled.

In point of error twenty-five, appellant alleges the trial court unconstitutionally failed to provide verdict forms that gave priority to the mitigation special issue and made it independent of the future dangerousness special issue. Appellant requested that the jury be provided verdict forms that placed the mitigation special issue before the future dangerousness special issue and that the jury be directed to answer the mitigation special issue before proceeding to the question of future dangerousness.

The order of the presentation of the special issues is dictated by Article 37.071, which provides that, upon conclusion of the presentation of evidence during punishment, the trial court shall submit the special issues to the jury. The jury is instructed that if it answers the future dangerousness issue affirmatively, only then must it answer the mitigation special issue. Art. 37.071, § 2(e). We have previously upheld the constitutionality of Article 37.071. *Threadgill*, 146 S.W.3d at 671. Appellant does not convince us to the contrary. Point of error twenty-five is overruled.

In the twenty-sixth point of error, appellant alleges that the trial court erred in refusing to instruct the jury that the State's burden of persuasion to obtain a death verdict is "beyond all doubt" rather than "beyond reasonable doubt." Appellant acknowledges that the Texas law requires the

"beyond reasonable doubt" standard rather the "beyond all doubt" standard. In fact, Appellant concedes that no state has adopted the "beyond all doubt" standard. There is no constitutional requirement that the State be held to a "beyond all doubt" standard. *See In re Winship*, 397 U.S. 358, 364 (1970) (stating that the "Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt."). Point of error twenty-six is overruled.

## THE "10-12" RULE

In his tenth point of error, appellant alleges that the trial court violated the Sixth, Eighth, and Fourteenth Amendments. He argues that the trial court failed to instruct jurors that a vote by one of them would result in a life sentence despite the statutory requirements of ten votes for a "no" response to the question of future dangerousness, or for a "yes" response to a finding of a mitigating circumstance. This Court has consistently upheld the "10-12" rule as constitutional. *Prystash v. State*, 3 S.W.3d 522,536 (1999); *McFarland v. State*, 928 S.W.2d 482, 519 (1996); *Lawton v. State*, 913 S.W.2d 542, 558-59 (1995). Appellant has given us no reason to revisit this issue. Point of error ten is overruled.

## PRECLUSION OF THE DEATH PENALTY

In point of error twenty, appellant complains that the trial court erred when it refused to preclude the death penalty as a sentencing option or to quash the indictment because the grand jury did not allege facts legally essential to the conviction and death sentence. Appellant contends that under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), he has the constitutional right to have the grand jury allege in the indictment all the specific facts legally essential to his death sentence, including facts supporting a negative response to the mitigation special issue. This Court has previously addressed this complaint and determined that neither

*Apprendi* nor *Ring* require the State to allege the special issues in the indictment. *Russeau v. State*, 171 S.W.3d 871, 885-86 (Tex. Crim. App. 2005); *Rayford v. State*, 125 S.W.3d 521, 533 (Tex. Crim. App. 2003). Point of error twenty is overruled.

In his twenty-first point of error, appellant alleges the trial court violated the Equal Protection Clause by failing to preclude the death penalty as a sentencing option. Appellant complains that there are no statewide standards to guide Texas prosecutors in deciding when they should seek the death penalty. This Court has previously considered and rejected this argument; appellant has given us no reason to reconsider our decision. *Threadgill*, 146 S.W.3d at 671-72. Point of error twenty-one is overruled.

## CUMULATIVE ERROR

In his twenty-eighth point of error, appellant urges this Court to consider the cumulative impact of the errors presented above. While a number of errors may be found harmful in its cumulative effect, *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999), cumulative error has not been shown here. *Wright v. State*, 28 S.W.3d 526, 537 (Tex. Crim. App. 2000). Point of error twenty-eight is overruled.

We affirm the judgment of the trial court.


DELIVERED NOVEMBER 5, 2008

DO NOT PUBLISH